Richard Smith
Savannah Rose
SMITH & LOWNEY, PLLC
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASTE ACTION PROJECT,                    )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )
                                         )          COMPLAINT
CITY OF SEATTLE,                         )
                                         )
                    Defendant.           )
                                         )
_____ )

## I.   INTRODUCTION

1.      This action is a citizen suit brought under Section 505 of the Clean Water Act ("CWA") as amended, 33 U.S.C. § 1365. Plaintiff, Waste Action Project, seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witnesses' fees, for Defendant City of Seattle's repeated and ongoing violations of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, the terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") permit authorizing certain stormwater discharges of pollutants from City of Seattle Department of Public Utilities' North Transfer Station SEA ("Seattle") in Seattle, Washington to navigable

COMPLAINT - 1

waters and discharges of pollutants to the King County sanitary sewer system in violation of prohibitions and standards under 33 U.S.C. § 1317 embodied by the requirements of the terms and conditions of its King County Industrial Waste Program Major Discharge Authorization ("Major Discharge Authorization").

## II.    JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over Waste Action Project's claims under Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Sections 309(d) and 505(a) and (d) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a) and (d), authorize the relief Waste Action Project requests.

3.      Under Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Waste Action Project notified the City of Seattle of it's violations of the CWA and of Waste Action Project's intent to sue under the CWA by letter dated and postmarked March 7, 2023 ("Notice Letter"). A copy of the Notice Letter is attached to this complaint as Exhibit 1. The allegations in the Notice Letter are incorporated herein by this reference. In accordance with section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2(a)(1), Waste Action Project notified the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Washington Department of Ecology ("Ecology") of its intent to sue Seattle by mailing copies of the Notice Letter to these individuals on March 10, 2023.

4.      At the time of the filing of this Complaint, more than sixty days have passed since the Notice Letter and copies thereof were issued in the manner described in the preceding paragraph.

5.      The violations complained of in the Notice Letter are continuing and/or are reasonably likely to re-occur.

COMPLAINT - 2

6.      At the time of the filing of this Complaint, neither the EPA nor Ecology has commenced any action constituting diligent prosecution to redress the violations alleged in the Notice Letter.

7.      The source of the violations complained of is in King County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington under Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b).

### III.      PARTIES

8.      Waste Action Project is suing on behalf of itself and its members.

9.      Waste Action Project is a non-profit corporation organized under the laws of the state of Washington. Waste Action Project is dedicated to protecting and preserving the environment of Washington State, especially the quality of its waters. Waste Action Project is a membership organization and has at least one member who is injured by Seattle's violations.

10.     Waste Action Project has representational standing to bring this action. Waste Action Project's members are reasonably concerned about the effects of discharges of pollutants, including stormwater from Defendant's facility, on water quality and aquatic species and wildlife that Waste Action Project's members observe, study, use, and enjoy. Waste Action Project's members are further concerned about the effects of discharges from Defendant's facility on human health. In addition, discharges from Defendant's facility lessen Waste Action Project's members' aesthetic enjoyment of nearby areas. Waste Action Project has members who live, work, fish, and recreate around or use Lake Union and the Puget Sound which is affected by Defendant's discharges. Waste Action Project's members' concerns about the effects of Defendant's discharges are aggravated by Defendant's failure to record and timely report information about its discharges and pollution controls in a timely manner. The recreational,

COMPLAINT - 3

scientific, economic, aesthetic, and/or health interest of Waste Action Project and its members have been, are being, and will be adversely affected by Defendant's violations of the CWA. The relief sought in this lawsuit can redress the injuries to these interests.

11.     Waste Action Project has organizational standing to bring this action. Waste Action Project has been actively engaged in a variety of educational and advocacy efforts to improve water quality and to address sources of water quality degradation in the waters of Western Washington, including Lake Union and the Puget Sounds. As detailed herein and in the Notice Letter, Defendant has failed to comply with numerous requirements of its NPDES permit and Major Discharge Authorization including completing corrective actions, compliance with water quality standards, Stormwater Pollution Prevention Plan maintenance, payment of Industrial Stormwater General Permit ("ISGP") fees, monitoring, recordkeeping, reporting, and requirements. As a result, Waste Action Project is deprived of information necessary to properly serve its members by providing information and taking appropriate action to advance its mission. Waste Action Project's efforts to educate and advocate for greater environmental protection, and to ensure the success of environmental restoration projects implemented for the benefit of its members are also obstructed. Finally, Waste Action Project and the public are deprived of information that influences members of the public to become members of Waste Action Project, thereby reducing Waste Action Project's membership numbers. Thus, Waste Action Project's organizational interests have been adversely affected by Defendant's violations. These injuries are fairly traceable to Defendant's violations and are redressable by the Court.

12.     The City of Seattle is a municipality of which Seattle Public Utilities is a department. Seattle Public Utilities is a public utilities agency authorized to conduct business under the laws of the state of Washington. The City and Seattle Public Utilities are referred to herein as "Seattle."

COMPLAINT - 4

13.     Seattle owns and operates a recycling and waste transfer station located at or about 1350 N 34th St, Seattle, WA 98103 (referred to herein as the "facility").

## IV.     LEGAL BACKGROUND

14.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person, unless in compliance with the provisions of the CWA. A discharge of a pollutant from a point source to waters of the United States without authorization by a NPDES permit, issued under Section 402 of the CWA, 33 U.S.C. § 1342, is prohibited.

15.     The state of Washington has established a federally approved state NPDES program administered by Ecology. Wash. Rev. Code § 90.48.260; Wash. Admin. Code ch. 173-220. This program was approved by the Administrator of the EPA pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

16.     Under Section 402 of the CWA, 33 U.S.C. § 1342, Ecology has repeatedly issued Industrial Stormwater General Permits, most recently on November 20, 2019, effective January 1, 2020, and set to expire December 31, 2024 (the "2020 ISGP Permit"). The previous permit was issued December 3, 2014, became effective January 2, 2015, and expired December 31, 2019 (the "2015 ISGP Permit"). The 2015 Permit and 2020 Permit (collectively, "the ISGP Permits"), contain substantially similar requirements and authorize those that obtain coverage thereunder to discharge stormwater associated with industrial activity, a pollutant under the CWA, and other pollutants contained in the stormwater to waters of the United States subject to certain terms and conditions.

17.     The ISGP Permits impose certain terms and conditions on those covered thereby, including requirements for monitoring and sampling of discharges, reporting and recordkeeping requirements, and restrictions on the quality of stormwater discharges. To reduce and eliminate pollutants in stormwater discharges, the ISGP Permits require, among other things, that

COMPLAINT - 5

permittees develop and implement best management practices ("BMPs") and a Stormwater Pollution Prevention Plan ("SWPPP"), and apply all known and reasonable methods of prevention, control, and treatment ("AKART") to discharges. The specific terms and conditions of the ISGP Permits are described in detail in the Notice Letter, attached hereto as Exhibit 1 and incorporated herein by this reference.

18.     Under Section 307 of the CWA, 33 U.S.C. § 1317, King County issues Major Discharge Authorizations. A Major Discharge Authorization allows covered parties to discharge limited amounts of wastewater—in accordance with certain effluent limitations and monitoring requirements imposed under the authority of 33 U.S.C. § 1317 and King County Code 28.84.060—to King County's sewer system. Seattle was granted authorization to discharge wastewater subject to the effluent limitations and other requirements and conditions set forth under the King County Industrial Waste Major Discharge Authorization No. 4365-01, effective April 5, 2016 and expired on April 4, 2021, and Major Discharge Authorization No. 4365-02, effective April 5, 2021 and expiring April 4, 2026.

19.     Dischargers that are also subject to federal categorial discharge limits under 33 U.S.C. § 1317 are subject to whichever limits are most restrictive, either the federal limits or local county discharge limits. King County's discharge standards and limitations are established to comply with current NPDES requirements of King County's authorization to discharge from its sanitary sewer system, and to protect sewerage facilities, treatment processes, public health and safety of the receiving waters, air quality, and biosolids quality. King County Code 28.24.060(D)(1). Seattle is required to comply with these local discharge limits. *See* King County Code 28.24.060(F). Limitation exceedances under the Authorization, King County Code, or federal or state pretreatment standards are violations of the Major Discharge Authorization and the CWA. King County Code 28.84.060(N)(1)(a).

COMPLAINT - 6

1

## V.    FACTS

2

**A.    Industrial Stormwater General Permit**

3      20.    Ecology granted Seattle coverage for the facility under the 2015 Permit under

4    Permit Number WAR303582. Ecology granted subsequent coverage under the 2020 Permit

5    under the same permit number, WAR303582.

6      21.    Seattle discharges stormwater and pollutants associated with industrial activity to

7    Lake Union.

8      22.    Seattle's facility is engaged in industrial activities including waste management

9    and remediation services among others. Seattle's facility has multiple distinct points of discharge

10    where stormwater and other pollutants leave the facility and eventually enter Lake Union.

11      23.    Seattle has violated and continues to violate the ISGP Permits and Sections 301(a)

12    and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by discharging pollutants in violation of

13    an NPDES Permit. Seattle's violations of the ISGP Permits are set forth in sections I through XII

14    of the Notice Letter attached hereto as <u>Exhibit 1</u> and are incorporated herein by this reference. In

15    particular, and among the other violations described in the Notice letter, Seattle has violated the

16    ISGP Permits by failing to comply with water quality standards, failing to comply with AKART

17    standards, failing to implement BMPs to control water quality, failing to implement corrective

18    actions, failing to establishing an adequate SWPPP, failing to collect and analyze quarterly

19    samples, failing to correctly and timely submit Discharge Monitoring Reports ("DMRs"), failing

20    to correctly and timely submit Annual Reports, failing to comply with sample timing and

21    frequency, failing to comply with effluent limit violations, failing to pay ISGP fees, failing

22    comply with visual monitoring requirements, failing to record information, failing to retain

23    records, and failing to report permit violations.

24

COMPLAINT - 7

24.     Seattle discharges stormwater from the facility containing levels of pollutants that exceed the benchmark values established by the ISGP Permits, including the days on which Seattle collected samples with the results identified in Table 1, and is likely to continue discharging comparably unacceptable levels of pollutants in its stormwater:

**Table 1: Monitoring Point 001 Benchmark Exceedances**

| Quarter in which sample was collected | Turbidity (Benchmark: 25 NTU) | Copper (Benchmark: 14 µg/L) | Zinc (Benchmark: 117 µg/L) |
|---|---|---|---|
| 4th Quarter 2016 | | 116 | |
| 3rd Quarter 2017 | | 38.6 | 213 |
| 1st Quarter 2018 | | 19.2 | |
| 3rd Quarter 2018 | | 21.3 | |
| 4th Quarter 2018 | | 19.8 | |
| 2nd Quarter 2019 | | 18.5 | |
| 3rd Quarter 2019 | | 16 | |
| 1st Quarter 2020 | 33.2 | 17.35 | |
| 3rd Quarter 2020 | | 24.5 | 136 |
| 2nd Quarter 2021 | | 20.1 | |
| 3rd Quarter 2021 | | 41.1 | |
| 4th Quarter 2022 | | 19 | |
| 1st Quarter 2023 | | 47 | 300 |

25.     The stormwater monitoring data provided in Table 1 shows benchmark exceedances included in the stormwater monitoring results that Seattle submitted to Ecology.

26.     Seattle discharges stormwater from its facility containing levels of pollutants that exceed the effluent limit established by the Permit, including the days on which Seattle collected samples with the results identified in this paragraph below, and is likely to continue discharging comparably unacceptable levels of pollutants:

| **Date of Violation** | **Reported TSS Value (Effluent Limit 30 mg/L)** |
|---|---|
| January 10, 2020 | 44 |
| September 23, 2020 | 32 |

COMPLAINT - 8

27.     The ISGP Permits requires Seattle's monitoring to be representative of discharges from the facility. The stormwater monitoring results that Seattle routinely submits to Ecology are not representative of the facility's stormwater discharges, as described in detail in section IV.A of the Notice Letter attached hereto as Exhibit 1.

28.     Seattle's stormwater discharges are causing or contributing to violations of water quality standards and therefore violate the ISGP Permits. Discharges from Seattle's facility contribute to the polluted conditions of the waters of the state, including the water quality standards of Lake Union. Discharges from Seattle's facility contribute to the ecological impacts that result from the pollution of these waters and to Waste Action Project and its members' injuries resulting therefrom. These requirements and Seattle's violations thereof are described in detail in section I and II of the Notice Letter, attached hereto as Exhibit 1, and incorporated herein by this reference.

29.     Seattle's exceedances of the benchmark values indicate that Seattle is failing to apply AKART to its discharges and/or is failing to implement an adequate SWPPP and BMPs. Seattle violated and continues to violate the ISGP Permits by not developing, modifying, and/or implementing BMPs in accordance with the requirements of the ISGP Permits, and/or by not applying AKART to discharges from the facility. These requirements and Seattle's violations thereof are described in detail in section I.B and section III of the Notice Letter, attached as Exhibit 1, and incorporated herein by this reference.

30.     Seattle has violated and continues to violate the monitoring requirements of the Permits. For example, the Permits require Seattle to sample its stormwater discharges once during every calendar quarter at each distinct point of discharge offsite except for substantially identical outfalls. However, Seattle has failed and is failing to monitor discharges from the multiple distinct points of discharge. Instead, Seattle is only collecting samples from one

COMPLAINT - 9

location. Seattle failed to collect and analyze stormwater samples at Monitoring Point 001 in the first quarter 2020 for E. coli, fourth quarter 2016 for TSS, first quarter 2017 for TSS, second quarter 2017 for TSS, third quarter 2017 for TSS, fourth quarter 2017 for TSS, first quarter 2018 for TSS, second quarter 2018 for TSS, third quarter 2018 for TSS, fourth quarter 2018 for TSS, first quarter 2019 for TSS, second quarter 2019 for TSS, third quarter 2019 for TSS, fourth quarter 2019 for TSS, third quarter 2022 for turbidity, third quarter 2022 for pH, third quarter 2022 for oil sheen, third quarter 2022 for copper, third quarter 2022 for zinc, third quarter 2022 for E. coli, third quarter 2022 for fecal coliform, and third quarter 2022 for TSS; Seattle failed to submit DMRs by the prescribed deadline for the first quarter of 2017 and fourth quarter of 2017; Seattle failed to comply with visual monitoring requirements by failing to conduct an Industrial Stormwater Monthly Inspection Reports by qualified personnel each and every month for the last five years; and Seattle failed to comply with sample timing and frequency including the "first fall storm event" per Permit Condition S4.B.1. The monitoring and inspection requirements and Seattle's violations thereof are described in section IV.E of the Notice Letter, attached hereto as Exhibit 1, and incorporated herein by this reference.

31.     Seattle has not conducted and/or completed the Level One Corrective Action responses as required by the ISGP Permits. These requirements of the ISGP Permits and Seattle's violations thereof are described in section V.A of the Notice Letter, attached hereto as Exhibit 1, and incorporated herein by this reference.

32.     Condition S8.B of the ISGP Permits require a permittee to undertake a Level One Corrective Action whenever it exceeds a benchmark value identified in Condition S5.A, Table 2 of the ISGP Permits and Condition S5.B.2, Table 3 of the 2015 Permit. A Level One Corrective Action comprises of conducting an inspection to investigate the cause, review of the SWPPP to ensure permit compliance, revisions to the SWPPP to include additional operational source

Smith & Lowney, pllc
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

control BMPs with the goal of achieving the applicable benchmark values in future discharges, signature and certification of the revised SWPPP, summary of the Level One Corrective Action in the Annual Report, and full implementation of the revised SWPPP as soon as possible, but no later than the DMR due date for the quarter the benchmark was exceeded. Condition S8.A of the 2020 Permit requires that the permittee implement any Level One Corrective Action required by the 2015 Permit.

33.     Seattle triggered Level One Corrective Action requirements for each benchmark range exceedance identified in Table 1 above. Seattle has violated the requirements of the ISGP Permits described above by failing to conduct a Level One Corrective Action in accordance with the ISGP Permits' conditions, including the required inspection to investigate the cause; review, revision, and certification of the SWPPP; the required implementation of additional BMPs; and the required summarization in the Annual Report, each time during the past five years that its quarterly stormwater sampling results were greater than a benchmark, including the benchmark exceedances listed in Table 1 above. These corrective action requirements and Seattle's violations thereof are described in section V.A of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and are incorporated herein by this reference.

34.     Condition S8.C of the ISGP Permits require a permittee to undertake a Level Two Corrective Action whenever it exceeds a benchmark value identified in Condition S5.A, Table 2 of the ISGP Permits and Condition S5.B.2, Table 3 of the 2015 Permit during any two quarters during a calendar year. A Level Two Corrective Action comprises review of the SWPPP to ensure permit compliance, revisions to the SWPPP to include additional structural source control BMPs with the goal of achieving the applicable benchmark values in future discharges, signature and certification of the revised SWPPP, summary of the Level Two Corrective Action in the

COMPLAINT - 11

Annual Report, and full implementation of the revised SWPPP as soon as possible, but no later than August 31st of the year following the triggering of the Level Two Corrective Action. Condition S8.A of the 2020 Permit requires that the permittee implement any Level Two Corrective Action required by the 2015 Permit.

35.     Seattle triggered Level Two Corrective Action requirements for each benchmark exceedance identified in Table 1 above that occurred in any two quarters of a calendar year. Seattle has violated the requirements of the ISGP Permits described above by failing to conduct a Level Two Corrective Action in accordance with Permit conditions, including the required review, revision, and certification of the SWPPP, the required implementation of additional structural source control BMPs, and the required summarization in the Annual Report, each time during the past five years that its quarterly stormwater sampling results were greater than a benchmark, for any two quarters during a calendar year, including the benchmark exceedances listed in Table 1 above. These violations include Seattle's failure to perform a Level Two Corrective Action for copper triggered by its stormwater sampling during calendar year 2019, 2020, and 2021. These corrective action requirements and Seattle's violations thereof are described in section V.B of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and are incorporated herein by this reference.

36.     Condition S8.D of the ISGP Permits require a permittee to undertake a Level Three Corrective Action whenever it exceeds a benchmark value identified in Condition S5 during any three quarters during a calendar year. A Level Three Corrective Action comprises review of the SWPPP to ensure permit compliance, revisions to the SWPPP to include additional treatment BMPs and operational and/or structural source control BMPs if necessary, with the goal of achieving the applicable benchmark values in future discharges, signature and

COMPLAINT - 12

certification of the revised SWPPP, summary of the Level Three Corrective Action in the Annual

Report, and full implementation of the revised SWPPP as soon as possible, but no later than

September 30 of the year following the triggering of the Level Three Corrective Action.

Condition S8.D also requires that before implementation of any BMPs that require site-specific

design or sizing of structures, equipment, or processes, that the permittee submit an engineering

report, plans, and specifications, and an Operation and Maintenance Manual to Ecology for

review, which must be submitted no later than May 15 prior to the Level Three Corrective

Action deadline. Condition S8.A of the 2020 Permit requires that the permittee implement any

Level Three Corrective Action required by the 2015 Permit.

37.     Seattle triggered Level Three Corrective Action requirements for each benchmark

exceedance identified in Table 1 above that occurred in any three quarters of a calendar year.

Seattle has violated the requirements of the ISGP Permits described above by failing to conduct a

Level Three Corrective Action in accordance with Permit conditions, including the required

review, revision, and certification of the SWPPP, the required implementation of additional

BMPs, the required submission of an engineering report and Operation and Maintenance

Manual, and the required summarization in the Annual Report, each time that its quarterly

stormwater sampling results were greater than a benchmark for any three quarters during a

calendar year, including the benchmark excursions listed Table 1 above. These violations include

Seattle's failure to perform a Level Three Corrective Action for copper triggered in the fourth

quarter of 2018, as indicated by Table 1. These corrective action requirements and Seattle's

violations thereof are described in section V.C of the Notice Letter, attached hereto as Exhibit 1,

and are incorporated herein by this reference.

COMPLAINT - 13

Smith & Lowney, pllc
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

38.     Seattle has failed and continues to fail to comply with recording and record keeping requirements of the ISGP Permits. These requirements and Seattle's violations thereof are described in section VI of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and are incorporated herein by this reference.

39.     Condition S9.E of the ISGP Permits requires Seattle to take certain actions, including reporting to Ecology, in the event Seattle is unable to comply with any terms and conditions of the ISGP Permits which may endanger human health or the environment. Seattle has failed to comply with these requirements of the ISGP Permits by failing to report and subsequently correct permit violations, including each and every time Seattle failed to comply with corrective action requirements as described above in paragraphs 30-36, each and every time Seattle failed to sample a stormwater discharge as described above in paragraph 29, and each and every time Seattle discharged stormwater with amounts of pollutants in excess of the Permit benchmarks and effluent limits as described in paragraphs 23-25 above.

40.     Condition S9.E of the 2015 Permit and Condition S9.F of the 2020 Permit require Seattle to take certain actions in the event it is unable to comply with any of the terms and conditions of the ISGP Permits which may endanger human health or the environment or exceed any numeric effluent limitation in the permit. Seattle must immediately take action to minimize potential pollution or otherwise stop the noncompliance, correct the problem, and immediately notify the appropriate Ecology regional office of the failure to comply. Seattle is also required to submit a detailed written report to Ecology, including specified details, within 5 days of the time it became aware of the circumstances unless Ecology requests an earlier submission. Seattle routinely violates these requirements, including each and every time it failed to comply with the corrective action requirements described in section V of the Notice Letter, attached hereto as

COMPLAINT - 14

Exhibit 1, and each and every time Seattle discharged stormwater with concentrations of pollutants in excess of the ISGP Permits' benchmarks or effluent limits, as described in Table 1 and paragraph 25 above. All these violations may endanger human health or the environment

41.     Condition S.11 of the ISGP Permits requires Seattle to pay ISGP fees assessed by Ecology and established in WAC 173-224. Seattle is in violation of this condition each time that it fails to pay its ISGP fees, including failing to pay its ISGP fees by the prescribed deadline in 2019 and 2020.

**B.     Major Discharge Authorization**

42.     Seattle also discharges wastewater to the West Point Treatment Plant, which is a publicly owned treatment works (POTW) owned by King County that discharges to the Puget Sound.

43.     Special Condition A.1 of the Major Discharge Authorization establishes the numerical effluent limitation for soluble sulfide at 0.1 mg/L. Seattle has violated this limitation, as indicated in Table 2 below.

**Table 2: Sample Site A10412 Soluble Sulfide Effluent Limitation Violations**

| Date on which sample was collected | Soluble Sulfide (Effluent Limitation: 0.1 mg/L) |
|---|---|
| December 19, 2016 | 5.4 |
| January 24, 2017 | 0.3 |
| May 18, 2018 | 2 |

44.     Page one of the Major Discharge Authorization establishes the numerical effluent limitation for the maximum industrial volume at 33,000 gpd. Seattle has violated this limitation, as indicated in Table 3 below.

**Table 3: Sample Site A10412 Maximum Industrial Volume Effluent Limitation Violations**

| Date on which sample was collected | Maximum Industrial Volume (Effluent Limitation: 33,000 gpd) |
|---|---|
| February 9, 2017 | 52,804 |

COMPLAINT - 15

| February 15, 2017 | 45,909 |
| April 2, 2019 | 69,548 |
| April 10, 2019 | 42,581 |
| December 20, 2019 | 95,809 |
| February 1, 2020 | 43,688.62 |
| February 6, 2020 | 40,685 |
| February 7, 2020 | 33,939 |
| December 20, 2020 | 106,267 |
| December 21, 2020 | 60,724 |
| January 11, 2021 | 65,717 |
| January 12, 2021 | 108,846 |

45.    General Condition B of the Major Discharge Authorization require Seattle to implement measures to prevent accidental spills or discharges of prohibited substances to the municipal sewer system. Seattle is in violation of this condition each time it failed to prevent spills or discharges of prohibited substances to the municipal sewer system, including the spills identified by the April 7, 2017 Ecology inspection report; 2017 Annual Report; 2018 Annual Report; 2020 Annual Report; ERTS #668871 on November 8, 2016; ERTS #674730 on July 31, 2017; ERTS #674907 on August 17, 2017; ERTS #676220 on September 30, 2017; and ERTS #688277 on April 5, 2019.

46.    Page one and General Condition H of the Major Discharge Authorization require Seattle to file an application for re-issuance of the Major Discharge Authorization at least 90 days prior to the expiration date. Seattle is in violation of these conditions because it submitted its application for re-issuance of Major Discharge Authorization No. 4365-01 that was due January 4, 2021 on January 27, 2021.

47.    Special Condition A.3. of the Major Discharge Authorization requires Seattle to notify the King County Industrial Waste Program ("KCIW") within 24 hours of learning of a soluble sulfide exceedance, collect a sample and submit new data to KCIW within 14 days of becoming aware of the soluble sulfide, and submit a written report to KCIW within 14 days of

COMPLAINT - 16

learning of a soluble sulfide exceedance. Seattle is in violation of this condition because it does not notify KCIW, collect a sample and submit new data to KCIW, and submit a written report to KCIW withing the prescribed timeline every time it has a soluble sulfide exceedance, as indicated in Table 2 above.

48.     The Major Discharge Authorization requires Seattle to take specific actions outlined in General Condition D in the event that it is unable to comply with any of the conditions of the Major Discharge Authorization. Seattle is in violation of this condition each time that it is unable to comply with the Major Discharge Authorization and does not perform the required actions.

49.     Each of Seattle's violations of the ISGP Permits and the CWA are ongoing in that they are currently occurring or are likely to re-occur at least intermittently in the future.

50.     A significant penalty should be imposed against Seattle pursuant to the penalty factors set forth in 33 U.S.C. § 1319(d).

51.     Seattle's violations were avoidable had Seattle been diligent in overseeing facility operations and maintenance.

52.     Seattle has benefited economically as a consequence of its violations and its failure to implement stormwater management improvements at the facility.

53.     In accordance with Section 505(c)(3) of the CWA, 33 U.S.C. § 1365(c)(3), and 40 C.F.R. § 135.4, Waste Action Project is mailing a copy of this Complaint to the Administrator of the EPA, the Regional Administrator for Region 10 of the EPA, and the Attorney General of the United States.

## VI.    CAUSES OF ACTION

**A.      First Cause of Action - NPDES Permit Violations**

COMPLAINT - 17

54.     The preceding paragraphs and the allegations in the Notice Letter attached hereto as <u>Exhibit 1</u> are incorporated herein.

55.     Seattle's violations of the ISGP Permits described herein and in the Notice Letter constitute violations of violations of "effluent standards or limitations" under the CWA per 33 U.S.C. § 1365(f)(7).

56.     No agency has taken an enforcement action constitution diligent prosecution or otherwise precluding claims under 33 U.S.C. §§ 1319 or 1365(a).

57.     Prior notice of violations and claims was provided to Defendant and others as required.

58.     These violations committed by Seattle are ongoing or are reasonably likely to continue to occur. Any and all additional violations of the ISGP Permits and the CWA which occur after those described in Waste Action Project's Notice Letter, but before a final decision in this action, should be considered ongoing violations subject to this Complaint.

59.     Without the imposition of appropriate civil penalties and the issuance of an injunction, Seattle is likely to continue to violate the ISGP Permits and the CWA to the further injury of Waste Action Project, its members, and others.

**B.      Second Cause of Action - Violations of 33 U.S.C. § 1317**

60.     The preceding paragraphs and the allegations in the Notice Letter attached hereto as <u>Exhibit 1</u> are incorporated herein.

61.     Seattle's violations of the Major Discharge Authorization described herein and in the Notice Letter constitute violations of violations of "effluent standards or limitations" under the CWA per 33 U.S.C. § 1365(f)(7) and violations of effluent standard or pretreatment standards under 33 U.S.C. § 1317.

COMPLAINT - 18

62.     No agency has taken an enforcement action constitution diligent prosecution or otherwise precluding claims under 33 U.S.C. §§ 1317, 1319, or 1365(a).

63.     Prior notice of violations and claims was provided to Defendant and others as required.

64.     These violations committed by Seattle are ongoing or are reasonably likely to continue to occur. Any and all additional violations of the ISGP Permits and the CWA which occur after those described in Waste Action Project's Notice Letter, but before a final decision in this action, should be considered ongoing violations subject to this Complaint.

65.     Without the imposition of appropriate civil penalties and the issuance of an injunction, Seattle is likely to continue to violate the Major Discharge Authorization and the CWA to the further injury of Waste Action Project, its members, and others.

## VII.    RELIEF REQUESTED

Wherefore, Waste Action Project respectfully requests that this Court grant the following relief:

A.     Issue a declaratory judgment that Seattle has violated and continues to be in violation of the ISGP Permits, Major Discharge Authorization, and Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342;

B.     Enjoin Seattle from operating the facility in a manner that results in further violations of the ISGP Permits, Major Discharge Authorization, and the CWA;

C.     Order Seattle to immediately implement a SWPPP that complies with the 2020 Permit and a plan for achieving compliance with the Major Discharge Authorization at the facility;

COMPLAINT - 19

1    D.    Order Seattle to allow Waste Action Project to participate in the development and

2  implementation of Seattle's SWPPP and compliance plan;

3    E.    Order Seattle to provide Waste Action Project, for a period beginning on the date

4  of the Court's Order and running for three years after Seattle achieves compliance with all of the

5  conditions of the ISGP Permits and Major Discharge Authorization, with copies of all reports

6  and other documents which Seattle submits to Ecology and King County regarding Seattle's

7  coverage under the ISGP Permits and Major Discharge Authorization at the facility at the time

8  these documents are submitted;

9    F.    Order Seattle to take specific actions to remediate the environmental harm caused

10  by its violations;

11    G.    Order Seattle to pay civil penalties of $59,973 per day of violation for each

12  violation committed by Seattle, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C.

13  §§ 1319(d) and 1365(a), and 40 C.F.R. § 19 and 19.4;

14    H.    Award Waste Action Project its litigation expenses, including reasonable

15  attorneys' and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. §

16  1365(d), and any other applicable authorization; and

17    I.    Award such other relief as this Court deems appropriate.

18

19    RESPECTFULLY SUBMITTED this 22th day of May, 2023

20

21    By:    **Smith & Lowney, PLLC**
By: *s/Richard A. Smith*
Richard A. Smith, WSBA #21788

22    By: *s/Savannah Rose*
Savannah Rose, WSBA #57062
Attorneys for Plaintiff

23    2317 E. John St.,

24

COMPLAINT - 20

Seattle, WA 98112
Tel: (206) 860-2124
Fax: (206) 860-4187
E-mail: richard@smithandlowney.com,
savannah@smithandlowney.com

COMPLAINT - 21

Exhibit 1

# SMITH & LOWNEY
## ─── PLLC ───
## ATTORNEYS AT LAW

March 7, 2023

**Via Certified Mail - Return Receipt Requested**
Ben Whitley
City of Seattle Public Utilities
700 5th Ave Suite 4900
Seattle, WA 98104

Managing Agent
North Transfer Station
1350 N 34th St
Seattle, WA 98103

Seattle City Clerk's Office
P.O. Box 94728
Seattle, WA  98124-4728

Re:     **NOTICE OF INTENT TO SUE UNDER THE CLEAN WATER ACT AND REQUEST FOR
        COPY OF STORMWATER POLLUTION PREVENTION PLAN**

Dear Managing Agent:

We represent Waste Action Project, P.O. Box 9281, Covington, WA 98042, (206) 849-5927.  Any response or correspondence related to this matter should be directed to us at the letterhead address.  This letter is to provide you with sixty days' notice of Waste Action Project's intent to file a citizen suit against Seattle Public Utilities' North Transfer Station facility ("North Transfer Station"), under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, for the violations described below.  This letter is also a request for a copy of the complete and current stormwater pollution prevention plan ("SWPPP") required by North Transfer Station's National Pollution Discharge Elimination System ("NPDES") permit.

North Transfer Station was granted coverage under the Industrial Stormwater General Permit ("ISGP") issued by the Washington Department of Ecology ("Ecology") effective January 2, 2015 and expired on December 31, 2019, under NPDES No. WAR303582 (the "2015 ISGP").  Ecology granted North Transfer Station coverage under the current iteration of the ISGP effective January 1, 2020, set to expire on December 31, 2024 (the "2020 ISGP"), which maintains the same permit number: WAR303582.



North Transfer Station was granted coverage under the Major Discharge Authorization issued by King County effective April 5, 2016 and expired on April 4, 2021, under No. 4365-01.  North Transfer submitted its Wastewater Discharge Authorization Application for renewal on January 27, 2021.  King County granted North Transfer Station coverage under its current Major Discharge Authorization in early April, under No. 4365-02.

North Transfer Station has violated and continues to violate effluent standards and limitations under the CWA (see 33 U.S.C. § 1365(f)) including the terms and conditions of the 2015 ISGP and the 2020 ISGP (collectively, the "ISGP") and Major Discharge Authorization No. 4365-01 and 4365-02 (collectively, the "Major Discharge Authorization") with respect to operations of, and discharges of stormwater and pollutants from, its facility located at or about 1350 N 34th St, Seattle, WA 98103 (the "facility") as described herein, to Lake Union via storm drain pipes.  The facility subject to this notice includes any contiguous or adjacent properties owned or operated by North Transfer Station.

Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of pollutants to navigable waters unless in compliance with the CWA.  Indirect dischargers to a publicly owned treatment works ("POTW") are regulated under Section 307 of the CWA, 33 U.S.C. § 1317, and are prohibited from discharging pollutants in violation of any effluent standard or prohibition or pretreatment standard.  Where a POTW develops prohibitions or limits on pollutants pursuant to 40 C.F.R. § 403.5(c), such limits are pretreatment standards for the purposes of Section 307(d) of the CWA.

The Major Discharge Authorization authorizes North Transfer Station to discharge wastewater to the West Point Treatment Plant, which is a POTW owned by King County that discharges to the Puget Sound.

# I.   COMPLIANCE WITH APPLICABLE ISGP STANDARDS

## A.  Compliance with Water Quality Standards

Condition S10.A of the ISGP prohibits discharges that cause or contribute to violations of water quality standards.  Water quality standards are the foundation of the CWA and Washington's efforts to protect clean water.  In particular, water quality standards represent the U.S. Environmental Protection Agency ("EPA") and Ecology's determination, based on scientific studies, of the thresholds at which pollution starts to cause significant adverse effects on fish or other beneficial uses.  For each water body in Washington, Ecology designates the "beneficial uses" that must be protected through the adoption of water quality standards.

A discharger must comply with both narrative and numeric criteria water quality standards.  WAC 173-201A-010; WAC 173-201A-510 ("No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria, except as provided for in this chapter.").  Narrative water quality standards provide legal mandates that supplement the numeric criteria.  Furthermore, the narrative water quality standard applies with equal force even if Ecology has established a numeric water quality standard.  Specifically, Condition S10.A of the ISGP require that North Transfer Station's discharges not cause or contribute to an excursion of Washington State water quality standards.

North Transfer Station discharges to the Lake Union via drainpipes.  North Transfer Station discharges stormwater that contains elevated levels of turbidity, copper, zinc, and TSS as indicated in Tables 1 and 2.  Moreover, the discharges North Transfer Station has sampled and reported underrepresent the polluted condition of its facility discharges, as explained below.  These discharges cause and/or contribute to violations

2

of water quality standards for turbidity, copper, zinc, and TSS in Lake Union, and have occurred each and every day during the last five years on which there was 0.1 inch or more of precipitation and continue to occur.  *See* WAC 173-201A-240 (including criteria for copper and zinc); WAC 173-201A-260 (including toxics and aesthetics criteria); WAC 173-201A-210 (including criteria for turbidity); WAC 173-201A-600 (use designations for fresh waters); and WAC 173-204 Part III (sediment quality standards).

**Table 1: Monitoring Point 001 Benchmark Exceedances**

| Quarter in which sample was collected | Turbidity (Benchmark: 25 NTU) | Copper (Benchmark: 14 µg/L) | Zinc (Benchmark: 117 µg/L) |
|---|---|---|---|
| 4th Quarter 2016 | | 116 | |
| 3rd Quarter 2017 | | 38.6 | 213 |
| 1st Quarter 2018 | | 19.2 | |
| 3rd Quarter 2018 | | 21.3 | |
| 4th Quarter 2018 | | 19.8 | |
| 2nd Quarter 2019 | | 18.5 | |
| 3rd Quarter 2019 | | 16 | |
| 1st Quarter 2020 | 33.2 | 17.35 | |
| 3rd Quarter 2020 | | 24.5 | 136 |
| 2nd Quarter 2021 | | 20.1 | |
| 3rd Quarter 2021 | | 41.1 | |
| 4th Quarter 2022 | | 19 | |

**B.      Compliance with AKART Standards**

Condition S10.C of the ISGP requires North Transfer Station to apply all known and reasonable methods of prevention, control, and treatment ("AKART") to all discharges, including preparation and implementation of an adequate SWPPP and best management practices ("BMPs").  North Transfer Station has violated and continues to violate these conditions by failing to apply AKART to its discharges or to implement an adequate SWPPP and BMPs as evidenced by the elevated levels of pollutants in its discharge indicated in Tables 1 and 2 and as described below in this Notice of Intent to Sue.

3

Condition S1.A of the ISGP requires that all discharges and activities authorized be consistent with the terms and conditions of the ISGP. North Transfer Station has violated these conditions by discharging and acting inconsistent with the conditions of the ISGP as described in this Notice of Intent to Sue.

## II.     ISGP EFFLUENT LIMITATION VIOLATIONS

Condition S6.C.1 of the ISGP requires permittees discharging to a "303(d)-listed" waterbody (Water Quality Category 5), either directly or indirectly through a stormwater drainage system must comply with the applicable sampling requirements and numeric effluent limits in Table 6 of the ISGP. The "applicable sampling requirements and numeric effluent limits" means the sampling and effluent limits in Table 6 that correspond to the specific parameter(s) the receiving water is 303(d)-listed for at the time of ISGP coverage, or TSS if the waterbody is 303(d)-listed for sediment quality at the time of ISGP coverage.

North Transfer Station discharges, via drainpipes, to Lake Union, which is 303(d)-listed for sediment quality. North Transfer Station's discharges are subject to a maximum daily effluent limitation of 30 mg/L for TSS. North Transfer Station discharges stormwater that contains elevated levels of TSS in excess of the corresponding numeric effluent limitation, as indicated in Table 2 below. Each and every one of these discharges is a separate violation of the ISGP.

**Table 2: Monitoring Point 001 Effluent Limitation Violations**

| Date on which sample was collected | TSS (Effluent Limitation: 30 mg/L) |
|---|---|
| January 10, 2020 | 44 |
| September 23, 2020 | 32 |

## III.    ISGP STORMWATER POLLUTION PREVENTION PLAN VIOLATIONS

North Transfer Station is in violation of the ISGP's SWPPP provisions as follows:

1.  Condition S3.A of the ISGP requires North Transfer Station to develop and implement a SWPPP that contains specified components. Condition S3.A.2 of the 2015 ISGP and Condition S3.A.1 of the 2020 ISGP require the SWPPP to specify BMPs necessary to provide AKART and ensure that discharges do not cause or contribute to violations of water quality standards. North Transfer Station has violated these requirements of the ISGP each and every day during the last five years and continues to violate them as it has failed to prepare and/or implement a SWPPP that includes AKART BMPs and BMPs necessary to comply with state water quality standards.

2.  Condition S3.A of the ISGP requires North Transfer Station to have and implement a SWPPP that is consistent with ISGP requirements, fully implemented as directed by ISGP conditions, and updated as necessary to maintain compliance with ISGP conditions. North Transfer Station has violated these requirements of the ISGP each and every day during the last five years and continues to violate them because its SWPPP is not consistent with ISGP requirements, has not been fully implemented, and has not been updated as necessary.

3.  The SWPPP fails to satisfy the requirements of Condition S3 of the ISGP because it does not adequately describe BMPs. Condition S3.B.4 of the ISGP requires that the SWPPP include a description of the BMPs that are necessary for the facility to eliminate or reduce the potential to contaminate stormwater.

4

Condition S3.A of the ISGP requires that the SWPPP include BMPs consistent with approved stormwater technical manuals or document how stormwater BMPs included in the SWPPP are demonstratively equivalent to the practices contained in the approved stormwater technical manuals, including the proper selection, implementation, and maintenance of all applicable and appropriate BMPs. *See Stormwater Management Manual for Western Washington,* July 2019, https://fortress.wa.gov/ecy/ezshare/wq/ISGP Permits/Flare/2019SWMMWW/Content/Resources/DocsForDownload/2019SWMMWW.pdf. North Transfer Station's SWPPP does not comply with these requirements because it does not adequately describe BMPs and does not include BMPs consistent with approved stormwater technical manuals nor does it include BMPs that are demonstratively equivalent to such BMPs with documentation of BMP adequacy.

4. North Transfer Station's SWPPP fails to satisfy the requirements of Condition S3.B.2 of the ISGP because it fails to include a facility assessment as mandated. The SWPPP fails to include an adequate facility assessment because it does not describe the industrial activities conducted at the site, the general layout of the facility including buildings and storage of raw materials, the flow of goods and materials through the facility, regular business hours, and seasonal variations in business hours or in industrial activities as required.

5. North Transfer Station's SWPPP fails to satisfy the requirements of Condition S3.B.1 of the ISGP because it does not include a site map that identifies significant features, the stormwater drainage and discharge structures, the stormwater drainage areas for each stormwater discharge point off-site, a unique identifying number for each discharge point, each sampling location with a unique identifying number, paved areas and buildings, areas of pollutant contact associated with specific industrial activities, conditionally approved non-stormwater discharges, surface water locations, areas of existing and potential soil erosion, vehicle maintenance areas, and lands and waters adjacent to the site that may be helpful in identifying discharge points or drainage routes.

6. North Transfer Station's SWPPP fails to comply with Condition S3.B.2.b of the ISGP because it does not include an inventory of industrial activities that identifies all areas associated with industrial activities that have been or may potentially be sources of pollutants as required. The SWPPP does not identify all areas associated with loading and unloading of dry bulk materials or liquids, outdoor storage of materials or products, outdoor manufacturing and processing, onsite dust or particulate generating processes, on-site waste treatment, storage, or disposal, vehicle and equipment fueling, maintenance, and/or cleaning, roofs or other surfaces exposed to air emissions from a manufacturing building or a process area, and roofs or other surfaces composed of materials that may be mobilized by stormwater as required by these conditions.

7. North Transfer Station's SWPPP does not comply with Condition S3.B.2.c of the ISGP because it does not include an adequate inventory of materials. The SWPPP does not include an inventory of materials that lists the types of materials handled at the site that potentially may be exposed to precipitation or runoff and that could result in stormwater pollution, a short narrative for material describing the potential for the pollutants to be present in stormwater discharge that is updated when data becomes available to verify the presence or absence of the pollutants, a narrative description of any potential sources of pollutants from past activities, materials and spills that were previously handled, treated, stored, or disposed of in a manner to allow ongoing exposure to stormwater as required. The SWPPP does not include the method and location of on-site storage or disposal of such materials and a list of significant spills and significant leaks of toxic or hazardous pollutants as these ISGP conditions require.

5

8.  North Transfer Station's SWPPP does not comply with Condition S3.B.3 of the ISGP because it does not identify specific individuals by name or title whose responsibilities include SWPPP development, implementation, maintenance, and modification.

9.  Condition S3.B.4 of the ISGP requires that permittees include in their SWPPPs and implement mandatory BMPs.  North Transfer Station is in violation of this requirement because it has failed to include in its SWPPP and implement the mandatory BMPs of the ISGP.

10.  North Transfer Station's SWPPP does not comply with Condition S3.B.4.b.i of the ISGP because it does not include required operational source control BMPs.  North Transfer Station fails to include operation source control BMPs in the following categories: good housekeeping (including the definition of ongoing maintenance and cleanup of areas that may contribute pollutants to stormwater discharges, and a schedule/frequency for each housekeeping task); preventive maintenance (including BMPs to inspect and maintain stormwater drainage, source controls, treatment systems, and plant equipment and systems, and the schedule/frequency for each task); spill prevention and emergency cleanup plan (including BMPs to prevent spills that can contaminate stormwater, for material handling procedures, storage requirements, cleanup equipment and procedures, and spill logs); employee training (including an overview of what is in the SWPPP, how employees make a difference in complying with the SWPPP, spill response procedures, good housekeeping, maintenance requirements, and material management practices, how training will be conducted, the frequency/schedule of training, and a log of the dates on which specific employees received training); inspections and recordkeeping (including documentation of procedures to ensure compliance with ISGP requirements for inspections and recordkeeping, identification of personnel who conduct inspections, provision of a tracking or follow-up procedure to ensure that a report is prepared and appropriate action taken in response to visual monitoring, definition of how North Transfer Station will comply with signature and record retention requirements, and certification of compliance with the SWPPP and Permit).  Some of the BMPs that North Transfer Station is failing to implement include those documented by Annual Reports; the April 7, 2017 Ecology inspection report; and Environmental Report Tracking System (ERTS) incident reports:

- Failure to minimize the exposure of material to stormwater, documented by the April 7, 2017 Ecology inspection report
- Failure adequately maintain equipment, documented by the April 7, 2017 Ecology inspection report; 2017 Annual Report; 2018 Annual Report; 2020 Annual Report; ERTS #668871 on November 8, 2016; ERTS #674730 on July 31, 2017; ERTS #674907 on August 17, 2017; ERTS #676220 on September 30, 2017; and ERTS #688277 on April 5, 2019
- Failure to prevent track out at the private vehicle exit, documented by the April 7, 2017 Ecology inspection report
- Failure to prevent and/or clean up trash and debris, documented by the April 7, 2017 Ecology inspection report
- Failure to inspect and maintain stormwater drainage and source controls, documented by the trash/debris in the catch basin noted in the April 7, 2017 Ecology inspection report
- Failure to ensure that vehicles have their loads covered, documented by the April 7, 2017 Ecology inspection report
- Failure to clean up spills and leaks immediately to prevent the discharge of pollutants, documented by the April 7, 2017 Ecology inspection report; 2017 Annual Report; 2018 Annual Report; 2020 Annual Report; ERTS #668871 on November 8, 2016; ERTS #674730 on July 31, 2017; ERTS #674907 on August 17, 2017; ERTS #676220 on September 30, 2017; and ERTS #688277 on April 5, 2019

6

- Failure to maintain stormwater treatment systems, documented by the blocked Contec filter system inlet line noted in the 2019 Annual Report

11.  North Transfer Station's SWPPP does not comply with Condition S3.B.4.b.i.7 of the ISGP because it does not include measures to identify and eliminate the discharge of process wastewater, domestic wastewater, noncontact cooling water, and other illicit discharges to stormwater sewers or surface waters and ground waters of the state, including failing to prevent solids from entering the stormwater and discharging off-site.

12.  North Transfer Station's SWPPP does not comply with Condition S3.B.4.b.ii of the ISGP because it does not include required structural source control BMPs to minimize the exposure of manufacturing, processing, and material storage areas to rain, snow, snowmelt, and runoff.

13.  North Transfer Station's SWPPP does not comply with Condition S3.B.4.b.iii of the ISGP because it does not include treatment BMPs as required.

14.  North Transfer Station's SWPPP fails to comply with Condition S3.B.4.b.v of the ISGP because it does not include BMPs to prevent the erosion of soils or other earthen materials and prevent off-site sedimentation and violations of water quality standards.

15.  North Transfer Station's SWPPP fails to satisfy the requirements of Condition S3.B.5 of the ISGP because it fails to include a stormwater sampling plan as required.  The SWPPP does not include a sampling plan that: identifies points of discharge to surface waters, storm sewers, or discrete ground water infiltration locations; documents why each discharge point is not sampled; identifies each sampling point by its unique identifying number; identifies staff responsible for conducting stormwater sampling; specifies procedures for sampling collection and handling; specifies procedures for sending samples to the a laboratory; identifies parameters for analysis, holding times and preservatives, laboratory quantization levels, and analytical methods; and specifies the procedure for submitting the results to Ecology.

## IV.   ISGP MONITORING AND REPORTING VIOLATIONS

### A.   Failure to Collect Quarterly Samples

Condition S4.B.2.c of the 2015 ISGP and S4.B.3.a of the 2020 ISGP require North Transfer Station to collect stormwater samples at each distinct point of discharge offsite except for substantially identical outfalls, in which case only one of the substantially identical outfalls must be sampled.  These conditions set forth sample collection criteria but require the collection of a sample even if the criteria cannot be met.  The facility has at least one distinct point of discharge off-site: Outfall 001.  There are additional unnamed distinct discharge points.

North Transfer Station has also violated and continues to violate these conditions because it does not sample each distinct point of discharge off-site.  These violations have occurred and continue to occur each and every quarter during the last five years that North Transfer Station was and is required to sample its stormwater discharges.

7

### B.      Failure to Analyze Quarterly Samples

Condition S5.A, Table 2, and Table 6 of the 2015 ISGP require North Transfer Station to analyze stormwater samples collected quarterly for turbidity, copper, zinc, pH, oil sheen, E. coli, fecal coliform, and TSS.  North Transfer Station violates these conditions by failing to analyze stormwater samples each and every quarter for the last five years including at Monitoring Point 001 in the first quarter of 2020 for E. coli, fourth quarter 2016 for TSS, first quarter 2017 for TSS, second quarter 2017 for TSS, third quarter 2017 for TSS, fourth quarter 2017 for TSS, first quarter 2018 for TSS, second quarter 2018 for TSS, third quarter 2018 for TSS, fourth quarter 2018 for TSS, first quarter 2019 for TSS, second quarter 2019 for TSS, third quarter 2019 for TSS, fourth quarter 2019 for TSS, third quarter 2022 for turbidity, third quarter 2022 for pH, third quarter 2022 for oil sheen, third quarter 2022 for copper, third quarter 2022 for zinc, third quarter 2022 for E. coli, third quarter 2022 for fecal coliform, and third quarter 2022 for TSS.

### C.      Failure to Correctly and Timely Submit Discharge Monitoring Reports

Condition S9.A of the 2015 ISGP and Condition S9.B of the 2020 ISGP require North Transfer Station to use Discharge Monitoring Report ("DMR") DMR forms provided or approved by Ecology to summarize, report, and submit monitoring data to Ecology.  For each monitoring period (calendar quarter) a DMR must be completed and submitted to Ecology not later than 45 days after the end of the monitoring period.  North Transfer Station has violated these conditions by failing to submit a DMR within the time prescribed for Monitoring Point 001 for the 1st quarter of 2017 and 4th quarter of 2017.

### D.      Failure to Correctly and Timely Submit Annual Reports

Condition S9.B of the ISGP requires North Transfer Station to submit an accurate and complete Annual Report to Ecology no later than May 15th of each year.  The Annual Report must include corrective action documentation as required in Condition S8.B-D of the ISGP.  If a corrective action is not yet completed at the time of submission of the Annual Report, North Transfer Station must describe the status of any outstanding corrective action.  Specific information to be included in the Annual Report is identification of the conditions triggering the need for corrective action, description of the problem and identification of dates discovered, summary of any Level One, Two, or Three Corrective Actions completed during the previous calendar year, including the dates corrective actions completed, and description of the status of any Level 2 or 3 Corrective Actions triggered during the previous calendar year, including identification of the date North Transfer Station expects to complete corrective actions.

North Transfer Station has violated this condition each time it failed to submit an accurate and complete Annual Report to Ecology including the 2021 Annual Report that failed to be signed.

### E.      Failure to Comply with Visual Monitoring Requirements

Condition S7.A of the ISGP requires that a monthly visual inspection be conducted at the facility by qualified personnel.  Condition S7.B of the ISGP requires each inspection to include observations made at stormwater sampling locations and areas where stormwater associated with industrial activity is discharged; observations for the presence of floating materials, visible oil sheen, discoloration, turbidity, odor, etc. in the stormwater discharges; observations for the presence of illicit discharges; a verification that the descriptions of potential pollutant sources required by the ISGP are accurate; a verification that the site map in the SWPPP

reflects current conditions; and an assessment of all BMPs that have been implemented (noting the effectiveness of the BMPs inspected, the locations of BMPs that need maintenance, the reason maintenance is needed and a schedule for maintenance, and locations where additional or different BMPs are needed). North Transfer Station has violated and continues to violate these requirements because, during the last five years, it has failed to conduct each of the requisite visual monitoring and inspections each and every month.

Condition S7.C of the ISGP requires that North Transfer Station record the results of each inspection in an inspection report or checklist that is maintained on-site and documents the observations, verifications, and assessments required. The report/checklist must include the time and date of the inspection; the locations inspected; a statement that, in the judgment of the person conducting the inspection and the responsible corporate officer, the facility is either in compliance or out of compliance with the SWPPP and the ISGP; a summary report and schedule of implementation of the remedial actions North Transfer Station plans to take if the site inspection indicates that the facility is out of compliance; the name, title, signature and certification of the person conducting the facility inspection; and a certification and signature of the responsible corporate officer or a duly authorized representative. North Transfer Station is in violation of these requirements because, during the last five years, it failed to prepare and maintain the requisite inspection reports or checklists and failed to make the requisite certifications and summaries.

## F.    Failure to Comply with Sample Timing and Frequency

Condition S4.B.1.a of the Permits requires that North Transfer Station sample the discharge from each designated location at least once per quarter. Condition S4.B.1.b of the Permits requires that North Transfer Station sample the stormwater discharge from the first fall storm event each year. "First fall storm event" means the first time on or after October 1st of each year that precipitation occurs and results in a stormwater discharge. Condition S4.B.1.c of the Permits requires that North Transfer Station collect samples within the first 12 hours of stormwater discharge events. If it is not possible to collect a sample within the first 12 hours of a stormwater discharge event, the Permittee must collect the sample as soon as practicable after the first 12 hours, and keep documentation with the sampling records explaining why it could not collect samples within the first 12 hours or if it is unknown. Condition S4.B.1.d of the Permits requires North Transfer Station to obtain representative samples.

North Transfer Station continues to violate these conidiations, including to failing to sample from all discharge points, mentioned above in section IV.A of this Notice of Intent to Sue.

## V.    ISGP CORRECTIVE ACTION VIOLATIONS

### A.    Violations of the Level One Requirements

Condition S8.B of the ISGP requires North Transfer Station take specified actions, called a "Level One Corrective Action," each time quarterly stormwater sample results exceed a benchmark value or are outside the benchmark range. Condition S5.A and Table 2 of the ISGP establish the following benchmarks: turbidity 25 NTU, total copper 14 µg/L, total zinc 117 µg/L, no visible oil sheen, and pH 5-9 SU.

As described by Condition S8.B of the ISGP, a Level One Corrective Action requires that within 14 days of receipt of sampling results that indicate a benchmark exceedance during a given quarter; or, for parameters other than pH or visible oil sheen, the end of the quarter, whichever is later, North Transfer Station:

9

(1) conduct an inspection to investigate the cause; (2) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the ISGP and contains the correct BMPs from the applicable Stormwater Management Manual; (3) make appropriate revisions to the SWPPP to include additional operational source control BMPs with the goal of achieving the applicable benchmark values in future discharges; (4) summarize the Level One Corrective Action in the Annual Report required under Condition S9.B of the ISGP; and (5) and sign, certify, and fully implement the revised SWPPP in accordance with Condition S3 of the ISGP and the applicable stormwater management manual as soon as possible, and no later than the DMR due date for the quarter the benchmark was exceeded.

North Transfer Station is in violation of the Level One Corrective Action requirements in the ISGP.  It failed to implement Level One Corrective Action within 14 days of receipt or the end of the quarter for each and every benchmark exceedance including the exceedances identified in Table 1.  North Transfer Station's failures to comply with the Level One Corrective Action requirements include the failure to perform the required review, revision and certification of the SWPPP; perform required implementation of additional BMPs; and complete the required summarization in the Annual Report each and every time for the last five years, its quarterly stormwater sampling results were greater than a benchmark.

## B.    Violations of the Level Two Requirements

Condition S8.C of the ISGP requires North Transfer Station take specified actions, called a "Level Two Corrective Action," each time quarterly stormwater sample results exceed an applicable benchmark value or are outside the benchmark range in any two quarters during a calendar year. The ISGP establish the benchmarks applicable to North Transfer Station, which are described in section V.A of this Notice of Intent to Sue.

As described by Condition S8.C of the ISGP, a Level Two Corrective Action requires North Transfer Station: (1) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the ISGP; (2) make appropriate revisions to the SWPPP to include additional structural source control BMPs with the goal of achieving the applicable benchmark value(s) in future discharges; (3) summarize the Level Two Corrective Action (planned or take) in the Annual Report required under Condition S9.B of the ISGP; and (4) sign, certify, and implement the revised SWPPP according to Condition S3 of the ISGP and the applicable stormwater management manual as soon as possible, and no later than August 31 of the following year.

North Transfer Station is in violation of the Level Two Corrective Action requirements of the ISGP for each instance over the last five years when quarterly stormwater sampling results from the facility were greater than a benchmark or outside the benchmark range, including the exceedances identified in Table 1, for any two quarters during a calendar year and North Transfer Station failed to conduct and complete a Level Two Corrective Action for discharges from its facility in accordance with ISGP's conditions by, inter alia, completing the required review, revision and certification of the SWPPP; performing required implementation of additional BMPs, including additional structural source control BMPs; and completing required summarization in the Annual Report.

## C.    Violations of the Level Three Requirements

Condition S8.D of the ISGP requires North Transfer Station take specified actions, called a "Level Three Corrective Action," each time quarterly stormwater sample results exceed an applicable benchmark value or are outside the benchmark range for any three quarters during a calendar year.  The ISGP establish the

benchmarks applicable to North Transfer Station, which are described in section V.A of this Notice of Intent to Sue.

As described by Condition S8.D of the ISGP, when North Transfer Station triggers a Level Three Corrective Action, it is required to: (1) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the ISGP; (2) make appropriate revisions to the SWPPP to include additional treatment BMPs with the goal of achieving the applicable benchmark value(s) in future discharges and additional operational and/or structural source control BMPs if necessary for proper function and maintenance of treatment BMPs, and sign and certify the revised SWPPP in accordance with Condition S3.A.6 of the ISGP; and (3) summarize the Level Three Corrective Action (planned or take) in the Annual Report required under Condition S9.B of the ISGP, including information on how monitoring, assessment, or evaluation information was (or will be) used to determine whether existing treatment BMPs will be modified/enhanced or it new/additional treatment BMPs will be installed.  Condition S8.D.2.b of the ISGP require that a licensed professional engineer, geologist, hydrogeologist, or certified stormwater quality professional must design and stamp the portion of the SWPPP that addresses stormwater treatment structures or processes.

Condition S8.D.3 of the ISGP requires that, before installing BMPs that require the site-specific design or sizing of structures, equipment, or processes to collect, convey, treat, reclaim, or dispose of industrial stormwater, North Transfer Station submit an engineering report, plans, and specifications, and an operations and maintenance manual to Ecology for review in accordance with chapter 173-204 of the Washington Administrative Code.  The engineering report must be submitted no later than the May 15th prior to the Level Three Corrective Action Deadline.  The plans and specifications and the operations and maintenance manual must be submitted to Ecology at least 30 days before construction/installation.

Condition S8.D.5 of the ISGP requires North Transfer Station fully implement the revised SWPPP according to condition S3 of the ISGP and the applicable stormwater management manual as soon as possible, and no later than September 30th of the following year.

North Transfer Station is in violation of the Level Three Corrective Action requirements of the ISGP for each instance over the last five years in which quarterly stormwater sampling results from the facility were greater than a benchmark or outside the benchmark range, including the exceedances identified in Table 1, for any three quarters during a calendar year and North Transfer Station failed to conduct and complete a Level Three Corrective Action for discharges from its facility in accordance with ISGP's conditions by, inter alia, performing the required review, revision and certification of the SWPPP; complying with the requirement to have a specified professional design and stamp the portion of the SWPPP pertaining to treatment; completing the required implementation of additional BMPs, including additional treatment BMPs; completing the required submission of an engineering report, plans, specifications, and an operations and maintenance plan; and including the required summarization in the annual report.

## VI.    VIOLATIONS OF THE ISGP RECORDKEEPING REQUIREMENTS

### A.    Failure to Record Information

Condition S4.B of the ISGP requires North Transfer Station record and retain specified information for each stormwater sample taken, including the sample date and time, a notation describing if North Transfer Station collected the sample within the first 12 hours of stormwater discharge event, an explanation of why

North Transfer Station could not collect a sample within the first 12 hours of a stormwater discharge event, the sample location, method of sampling and of preservation, and the individual performing the sampling. North Transfer Station is in violation of these conditions as it has not recorded each of these specified items for each sample taken during the last five years.

### B.    Failure to Retain Records

Condition S9.C of the 2015 ISGP and S9.D of the 2020 ISGP require North Transfer Station to retain for a minimum of five years a copy of the current Permit, a copy of North Transfer Station's coverage letter, records of all sampling information, inspection reports including required documentation, any other documentation of compliance with ISGP requirements, all equipment calibration records, all BMP maintenance records, all original recordings for continuous sampling instrumentation, copies of all laboratory results, copies of all required reports, and records of all data used to complete the application for the Permit. North Transfer Station is in violation of these conditions because it has failed to retain records of such information, reports, and other documentation during the last five years.

## VII.   FAILURE TO REPORT ISGP VIOLATIONS

Condition S9.E of the 2015 ISGP and Condition S9.F of the 2020 ISGP require North Transfer Station to take certain actions in the event it is unable to comply with any of the terms and conditions of the ISGP which may endanger human health or the environment or exceed any numeric effluent limitation in the permit. In such circumstances, North Transfer Station must immediately take action to minimize potential pollution or otherwise stop the noncompliance and correct the problem, and North Transfer Station must immediately notify the appropriate Ecology regional office of the failure to comply. North Transfer Station must then submit a detailed written report to Ecology, including specified details, within 5 days of the time North Transfer Station became aware of the circumstances unless Ecology requests an earlier submission.

North Transfer Station routinely violates these requirements, including each and every time it failed to comply with the corrective action requirements described in section V of this Notice of Intent to Sue, each and every time North Transfer Station discharged stormwater with concentrations of pollutants in excess of the ISGP benchmarks, as described in Tables 1 and 2 above. All these violations may endanger human health or the environment.

## VIII.   FAILURE TO TIMELY PAY ISGP FEES

Condition S.11 of the ISGP requires North Transfer Station to pay ISGP fees assessed by Ecology and established in WAC 173-224. North Transfer Station is in violation of this condition each time that it fails to pay its ISGP fees, including failing to pay its ISGP fees by the prescribed deadline in 2019 and 2020.

## IX.   MAJOR DISCHARGE AUTHORIZATION EFFLUENT LIMITITATION VIOLATIONS

Special Condition A.1 of the Major Discharge Authorization establishes the numerical effluent limitation for soluble sulfide at 0.1 mg/L. North Transfer Station has violated this limitation, as indicated in Table 3 below.

**Table 3: Sample Site A10412 Soluble Sulfide Effluent Limitation Violations**

| Date on which sample was collected | Soluble Sulfide (Effluent Limitation: 0.1 mg/L) |
|---|---|
| December 19, 2016 | 5.4 |
| January 24, 2017 | 0.3 |
| May 18, 2018 | 2 |

Page one of the Major Discharge Authorization establishes the numerical effluent limitation for the maximum industrial volume at 33,000 gpd.  North Transfer Station has violated this limitation, as indicated in Table 4 below.

**Table 4: Sample Site A10412 Maximum Industrial Volume Effluent Limitation Violations**

| Date on which sample was collected | Maximum Industrial Volume (Effluent Limitation: 33,000 gpd) |
|---|---|
| February 9, 2017 | 52,804 |
| February 15, 2017 | 45,909 |
| April 2, 2019 | 69,548 |
| April 10, 2019 | 42,581 |
| December 20, 2019 | 95,809 |
| February 1, 2020 | 43,688.62 |
| February 6, 2020 | 40,685 |
| February 7, 2020 | 33,939 |
| December 20, 2020 | 106,267 |
| December 21, 2020 | 60,724 |
| January 11, 2021 | 65,717 |
| January 12, 2021 | 108,846 |

## X.   FAILURE TO PREVENT SPILLS AND PROHIBITED DISCHARGES OF THE MAJOR DISCHARGE AUTHORIZATION

General Condition B of the Major Discharge Authorization require North Transfer Station to implement measures to prevent accidental spills or discharges of prohibited substances to the municipal sewer system, including secondary containment of chemicals and wastes, elimination of connections to the municipal sewer system, and spill response equipment.  North Transfer Station is in violation of this condition each time it failed to prevent spills or discharges of prohibited substances to the municipal sewer system, including the spills identified by the April 7, 2017 Ecology inspection report; 2017 Annual Report; 2018 Annual Report; 2020 Annual Report; ERTS #668871 on November 8, 2016; ERTS #674730 on July 31, 2017; ERTS #674907 on August 17, 2017; ERTS #676220 on September 30, 2017; and ERTS #688277 on April 5, 2019.

## XI.   FAILURE TO TIMELY REAPPLY FOR RE-ISSUANCE OF THE MAJOR DISCHARGE AUTHORIZATION

Page one and General Condition H of the Major Discharge Authorization require North Transfer Station to file an application for re-issuance of the Major Discharge Authorization at least 90 days prior to the expiration date.  North Transfer Stations Major Discharge Authorization No. 4365-01 expired on April 4, 2021

and its application for re-issuance was due on January 4, 2021.  North Transfer Station is in violation of these conditions because it submitted its application for re-issuance of Major Discharge Authorization No. 4365-01 on January 27, 2021.

## XII.   FAILURE TO REPORT MAJOR DISCHARGE AUTHORIZATION VIOLATIONS

Special Condition A.3.a of the Major Discharge Authorization requires North Transfer Station to notify the King County Industrial Waste Program (KCIW) within 24 hours of learning of a soluble sulfide exceedance.  North Transfer Station is in violation of this condition because it does not notify KCIW every time it has a soluble sulfide exceedance, including the exceedance on May 18, 2018, as indicated in Table 3.

Special Condition A.3.b of the Major Discharge Authorization requires North Transfer Station to collect a sample and submit new data to KCIW within 14 days of becoming aware of the soluble sulfide.  North Transfer Station is in violation of this condition because it does not collect a sample and submit new data to KCIW within 14 days of becoming aware of each soluble sulfide exceedance, including the exceedance on May 18, 2018, as indicated in Table 3.

Special Condition A.3.c of the Major Discharge Authorization requires North Transfer Station to submit a written report to KCIW within 14 days of learning of a soluble sulfide exceedance.  North Transfer Station is in violation of this condition because it does not submit a written report to KCIW within 14 days of learning of each soluble sulfide exceedance, including the exceedance on May 18, 2018, as indicated in Table 3.

General Condition D of the Major Discharge Authorization requires North Transfer Station to take the following actions in the event that it is unable to comply with any of the conditions of the Major Discharge Authorization because of breakdown of equipment or facilities, an accident caused by human error, negligence, or any other cause: (1) take immediate action to stop, contain, and clean up the unauthorized discharges and correct the problem; (2) immediately notify KCIW and, if after 5 p.m. weekdays and on weekends, call the emergency King County treatment plant phone number on Page 1 of the Major Discharge Authorization so steps can be taken to prevent damage to the sewer system; and (3) submit a written 14-day report describing the breakdown, the actual quantity and quality of resulting waste discharged, corrective actions taken, and the steps to prevent recurrence.  North Transfer Station is in violation of this condition each time that it is unable to comply with the Major Discharge Authorization and does not perform the required actions.

## XIII.   REQUEST FOR SWPPP

Pursuant to Condition S9.F of the 2015 ISGP and Condition S9.G of the 2020 Permit, Waste Action Project hereby requests that North Transfer Station provide a copy of, or access to, its SWPPP complete with all incorporated plans, monitoring reports, checklists, and training and inspection logs.  The copy of the SWPPP and any other communications about this request should be directed to the undersigned at the letterhead address.

Should North Transfer Station fail to provide the requested complete copy of, or access to, its SWPPP as required by Condition S9.F of the 2015 ISGP and Condition S9.G of the 2020 Permit, it will be in violation of that condition, which violation shall also be subject to this Notice of Intent to Sue and any ensuing lawsuit.

14

## XIV.   CONCLUSION

The above-described violations reflect those indicated by the information currently available to Waste Action Project.  These violations are ongoing.  Waste Action Project intends to sue for all violations, including those yet to be uncovered and those committed after the date of this Notice of Intent to Sue.

Under Sections 309(g)(2)(A) and 404(s)(4) of the CWA, 33 U.S.C. §§ 1319(d) and 1344(s)(4), each of the above-described violations subjects the violator to a penalty of up to $56,461 per day for each violation.  In addition to civil penalties, Waste Action Project will seek injunctive relief to prevent further violations under Sections 505(a) and (d) of the CWA, 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law.  Also, Section 505(d) of the CWA, 33 U.S.C. § 1365(d), ISGP permits prevailing parties to recover costs, including attorney's fees.

Waste Action Project believes that this NOTICE OF INTENT TO SUE sufficiently states grounds for filing suit.  We intend, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against North Transfer Station under Section 505(a) of the Clean Water Act for violations.

During the 60-day notice period, we would be willing to discuss effective remedies for the violations addressed in this letter and settlement terms.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within 10 days of receiving this notice so that a meeting can be arranged and so that negotiations may be completed promptly.  We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends.

Sincerely,

Smith & Lowney, PLLC

By: _s/Savannah Rose_
Savannah Rose
Richard A. Smith

cc:    Michael Regan, Administrator, U.S. EPA
       Michelle Pirzadeh, Acting Region 10 Administrator, U.S. EPA
       Laura Watson, Director, Washington Department of Ecology